FILED

2022 Mar-30  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

PFE/JBW/DBL: April 2022
GJ#29

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| JOHN HORNBUCKLE | ) |

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### THE DEFENDANT AND RELATED INDIVIDUALS AND ENTITIES

1.     **JOHN HORNBUCKLE** resided in Huntsville, Alabama.  He served as President and CEO of QBR, LLC (QBR), which was a company that provided electro-diagnostic testing.

2.     Doctor 1 resided in Huntsville, Alabama.  Doctor 1 owned and operated Valley Center for Nerve Studies and Rehabilitation ("Valley Center") and billed insurers for electro-diagnostic testing performed by QBR technicians.

3.     Doctor 2 worked for Valley Center and interpreted the results of electro-diagnostic testing performed by QBR technicians.

4.     Dr. Mark Murphy operated pain clinics in Tennessee and Alabama.

**HORNBUCKLE** paid Dr. Murphy, through QBR, to refer patients to QBR for electro-diagnostic testing.

5.     Doctor 3 was a physician at a pain clinic in Rainbow City, Alabama. **HORNBUCKLE** paid Doctor 3's pain clinic, through QBR, to refer patients to QBR for electro-diagnostic testing.

<u>**QBR** AND **NERVE** **TESTING**</u>

6.     QBR was an Alabama limited liability company with its principal place of business in Huntsville, Alabama.  It did business under the name Diagnostic Referral Community.  QBR was in the business of, among other things, conducting electro-diagnostic testing, including nerve conduction velocity tests (NCV tests) and sensory evoked potential tests (SEP tests).

7.     An NCV test, also called a nerve conduction study, measures how fast an electrical impulse moves through a patient's nerve and is used to identify nerve damage.  An NCV test is performed by running an electrical impulse through the nerve being tested.

8.     An SEP test measures electrical activity in the brain in response to stimulation of sight, sound, or touch.

9.     QBR employed technicians to perform NCV and SEP tests on patients referred to QBR by physicians, and QBR provided the testing equipment for those tests.  QBR technicians went to the referring physician office to perform testing on

patients there.  In exchange for referring patients to QBR, QBR paid the referring physician or the referring physician's practice a fee for each patient referred.

10.    QBR sent the NCV and SEP test results to Valley Center, which was operated by Doctor 1.  The test results were generally interpreted by Doctor 2.  After tests were interpreted, a separate billing company, owned by Doctor 1, used Doctor 1's National Provider Identifier (NPI) number to bill each patient's insurance for the testing.  An NPI number is a unique ten-digit number used by healthcare providers to identify themselves.  Later, the billing company used Doctor 2's NPI number to bill the patient's insurance for the testing.  Regardless of whether Doctor 1's or Doctor 2's NPI number was used, Valley Center was then paid by the patient's insurance for the testing.

11.    Doctor 1 and **HORNBUCKLE** had an agreement whereby Valley Center then paid money it received from insurance to QBR.  During a certain period, QBR then paid a portion of the money back to Valley Center.

<u>**BILLING FOR MEDICAL SERVICES**</u>

12.    Various public and private entities offer health insurance plans to cover medical care, pharmaceuticals, diagnostic tests, and other services provided to individuals covered by those plans, who are often referred to as "beneficiaries" or "members."

13.    Blue Cross Blue Shield of Alabama (BCBSAL) is a private health

insurance company that provides medical insurance in Alabama and elsewhere.

14.    The Medicare program is a federal healthcare benefit program providing benefits to persons over the age of 65 or disabled.    Medicare is administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services.

15.    TRICARE is a health care benefit program of the United States Department of Defense (DOD) Military Health System that provides certain medical insurance coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors.

16.    The Alabama Medicaid program provides medical insurance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.  The Medicaid program is jointly financed by the federal and state governments.

17.    BCBSAL, Medicare, TRICARE, and Medicaid make insurance payments directly to a provider of medical services or goods, rather than to a beneficiary.  This payment occurs after the provider submits the claim to the healthcare benefit program for payment, either directly or through a billing company.  By enrolling in BCBSAL, Medicare, TRICARE, or Medicaid, and then submitting a claim for payment, a healthcare provider is certifying that services or

goods being provided to a patient are provided in accordance with the requirements of the insurer.

18.   BCBSAL, Medicare, TRICARE, and Medicaid will pay a medical provider only for medical services or goods that are medically necessary for the treatment of the patient being provided the services or goods.

19.   In addition, BCBSAL, Medicare, TRICARE, and Medicaid will not pay for medical services or goods that were provided in violation of the federal Anti-Kickback Statute.

20.   BCBSAL, Medicare, TRICARE, and Medicaid require providers to collect co-pays, typically a fixed amount, from patients, in part so that the patient is financially motivated to decline medically unnecessary or otherwise fraudulent services or goods.

21.   Medicare, TRICARE, and Medicaid are "federal health care programs," as defined in Title 42, United States Code, Section 1320a-7b(f). BCBSAL, Medicare, TRICARE, and Medicaid are all "health care benefit programs," as defined in Title 18, United States Code, Section 24(b).

## COUNT ONE
Conspiracy to Pay and Receive Kickbacks
[18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1))]

22.   The allegations in Paragraphs 1 through 21 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

23.     From at least in or about December 2012 and continuing through in or about January 2018 within Madison County in the Northern District of Alabama and elsewhere, defendant

**JOHN HORNBUCKLE**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury:

      a.     to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs and the United States Department of Defense in its administration and oversight of TRICARE, in violation of Title 18, United States Code, Section 371;

      b.     to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to: (A) any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which

payment may be made in whole and in part under Federal health care programs, that is, Medicare, Medicaid, and TRICARE; and (B) purchase, lease, order, and arrange for and recommend purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care program, that is, Medicare, Medicaid, and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(2); and

c.    to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for: (A) referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under Federal health care programs, that is, Medicare, Medicaid, and TRICARE; and (B) purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, that is, Medicare, Medicaid, and

TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(1).

## Purpose of the Conspiracy

24.     It was the purpose of the conspiracy for defendant **HORNBUCKLE** and his co-conspirators to unlawfully enrich and benefit themselves by: (1) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that orders for electro-diagnostic testing, including NCV and SEP testing, for Medicare, Medicaid, and TRICARE beneficiaries would be referred to and performed by QBR; (2) submitting and causing to be submitted claims to Medicare, Medicaid, and TRICARE for these items and services based on these referrals; (3) concealing and disguising the payment, receipt, and transfer of illegal kickbacks and the proceeds of the fraud; and (4) using proceeds of the scheme for their personal use and benefit and the use and benefit of others.

## Manner and Means

25.     The manner and means by which defendant **HORNBUCKLE** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

26.     **HORNBUCKLE** offered and paid providers, including Dr. Murphy and Doctor 3's pain clinic, in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary

electro-diagnostic testing.

27.     For example, **HORNBUCKLE** caused QBR to pay providers a flat fee for each patient that provider referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs.  These payments were disguised as hourly payments for the provider's time and the time of the provider's staff, but the provider was actually compensated on a per-patient basis.

28.     Dr. Mark Murphy and other providers solicited and received kickbacks in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.

29.     **HORNBUCKLE** caused QBR to pay Dr. Murphy over $1 million in kickbacks.  As a result, QBR caused Federal health care programs to be billed over $8.3 million for electro-diagnostic testing performed on patients referred by Dr. Murphy.

30.     **HORNBUCKLE** caused QBR to pay Doctor 3's pain clinic over $100,000 in kickbacks.  As a result, QBR caused Federal health care programs to be billed over $2.1 million for electro-diagnostic testing performed on patients referred by Doctor 3.

31.     **HORNBUCKLE** also paid independent sales representatives a flat fee for each patient that a provider associated with that sales representative referred to QBR for testing once that testing was reimbursed by insurers, including by Federal

9

health care programs.

## **Overt Acts**

32.     In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Alabama and elsewhere, at least one of the following overt acts, among others:

33.     On or about December 21, 2012, **HORNBUCKLE** caused QBR to pay an $18,000 kickback to Dr. Murphy.

34.     On or about July 11, 2016, Medicare was billed over $2,000 for electro-diagnostic testing performed by QBR on a patient referred by Dr. Murphy.

35.     On or about July 18, 2016, **HORNBUCKLE** caused QBR to pay a $7,000 kickback to Dr. Murphy.

36.     On or about November 16, 2016, Medicare was billed over $2,000 for electro-diagnostic testing performed by QBR on a patient referred by Doctor 3.

37.     On or about November 21, 2016, **HORNBUCKLE** caused QBR to pay a $10,850 kickback to Doctor 3's pain clinic.

38.     On November 29, 2016, **HORNBUCKLE** caused QBR to pay a $32,815 kickback to a company owned by a sales representative for electro-diagnostic testing performed by QBR on a patient referred by providers associated with that sales representative.

10

39.     On or about July 13, 2017, Medicare was billed over $2,000 for electro-diagnostic testing performed by QBR on a patient referred by Dr. Murphy.

40.     On or about July 19, 2017, **HORNBUCKLE** caused QBR to pay a $7,000 kickback to Dr. Murphy.

41.     On or about December 27, 2017, Medicare was billed over $1,500 for electro-diagnostic testing performed by QBR on a patient referred by Doctor 3.

42.     On or about January 8, 2018, **HORNBUCKLE** caused QBR to pay a $7,100 kickback to Doctor 3's pain clinic.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
Healthcare Fraud Conspiracy
[18 U.S.C. § 1349 (18 U.S.C. § 1347)]

43.     Paragraphs 1 through 42 of this Indictment are realleged and incorporated as though fully set forth herein.

44.     From at least in or about December 2012 and continuing through in or about January 2018 within Madison County in the Northern District of Alabama and elsewhere, defendant

## JOHN HORNBUCKLE

did knowingly and willfully conspire, combine, confederate and agree with others known and unknown to the Grand Jury to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United

11

States Code, Section 24(b), that is, Medicare, Medicaid, TRICARE, BCBSAL, and others, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

45.    It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, Medicaid, TRICARE, BCBSAL, and others for claims for items and services that were: (i) medically unnecessary, (ii) not eligible for reimbursement, (iii) not provided as represented, and (iv) based on kickbacks and bribes; (b) concealing the submission of false and fraudulent claims to Medicare, Medicaid, TRICARE, BCBSAL, and others and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

### Manner and Means

46.    The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among

others, the following:

47.     **HORNBUCKLE** offered and paid providers in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.

48.     **HORNBUCKLE** offered and paid kickbacks to sales representatives in the form of direct and indirect remuneration in exchange for and for the purpose of causing those sales representatives to induce providers to refer medically unnecessary electro-diagnostic testing to QBR.

49.     Doctor 1 billed health care benefit programs, including Medicare, Medicaid, TRICARE, BCBSAL, and others, for medically unnecessary electro-diagnostic testing.

50.     **HORNBUCKLE** and Doctor 1 failed to collect mandatory patient co-pays due for electro-diagnostic testing to incentivize patients not to decline the medically unnecessary procedures.

51.     Doctor 1 improperly hid from insurers who was performing and interpreting the results of the electro-diagnostic testing.

52.     In total, health care benefit programs, including Medicare, Medicaid, TRICARE, BCBSAL, and others, were billed over $20 million for medically unnecessary electro-diagnostic testing performed by QBR on patients referred by providers who had been paid kickbacks by QBR.

13

All in violation of Title 18, United States Code, Section 1349.

### COUNT 3
Money Laundering Conspiracy
[18 U.S.C. § 1956(h) (18 U.S.C. § 1957)]

53.     Paragraphs 1 through 52 of this Indictment are realleged and incorporated as though fully set forth herein.

54.     From at least in or about April 2014 and continuing through in or about June 2017 within Madison County in the Northern District of Alabama and elsewhere, defendant

### JOHN HORNBUCKLE

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit an offense under Title 18, United States Code Section 1957, to wit: to knowingly engage in a monetary transaction by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property being derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.  It is further alleged that the specified unlawful activity is health care fraud, in violation of Title 18, United States Code, Section 1347.

**Manner and Means**

55.     The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

56.     **HORNBUCKLE** conspired with Doctor 1 to cause monetary transactions of criminally derived property of a value greater than $10,000 by transferring money by check from an account controlled by QBR to an account controlled by Valley Center.

All in violation of Title 18, United States Code, Section 1956(h).

## FIRST NOTICE OF FORFEITURE
## 18 U.S.C. § 982(a)(7)

1.     The allegations in COUNT 1 through COUNT 3 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2.     Upon conviction of the offenses set forth in COUNT 1 through COUNT 3 of this Indictment, defendant **JOHN HORNBUCKLE** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3.     The property to be forfeited includes, but is not limited to, forfeiture money judgments in United States currency, representing the amount of proceeds

obtained, controlled, and benefited from as a result of the offenses alleged.

4.     If any of the property described above, as a result of any act or omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

A TRUE BILL

*/s/Electronic Signature*

_____
FOREPERSON OF THE GRAND JURY

PRIM F. ESCALONA
United States Attorney

*/s/Electronic Signature*

_____
JOHN B. WARD
Assistant United States Attorney

*/s/Electronic Signature*

_____
DON B. LONG III
Assistant United States Attorney